# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 04-03V
### Filed:  October 7, 2014
### (Not to be published)

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| JOSEPH HASSON and LYNETTE HASSON, as Parents and Guardians for I.J.H., a minor, | Decision on Attorneys' Fees and Costs; Reduction of Claimed Attorney Hours and Rates |
| Petitioners, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES | |
| Respondent. | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

*Paul Honigberg, Blank Rome, LLP, Washington, DC, for Petitioners.*
*Linda Renzi, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION (ATTORNEYS' FEES AND COSTS)

**HASTINGS, Special Master**.

In this case under the National Vaccine Injury Compensation Program (hereinafter "the Program[1]), Joseph and Lynette Hasson ("Petitioners") seek an award for attorneys' fees and expenses incurred in the course of the Petitioners' attempt to obtain Program compensation. After careful consideration, I have determined to grant the request in part, and deny it in part, for the reasons set forth below.

---

[1] The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2006). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2006).

# I

# THE OMNIBUS AUTISM PROCEEDING

This case concerning I.J.H. is one of more than 5,400 cases filed under the Program in which petitioners alleged that conditions known as "autism" or "autism spectrum disorders" ("ASD") were caused by one or more vaccinations.  A brief summary of one aspect of that history is relevant to this Decision.

In anticipation of dealing with such a large group of cases involving a common factual issue – *i.e.*, whether vaccinations can cause autism – the Office of Special Masters ("OSM") devised special procedures.  On July 3, 2002, the Chief Special Master, acting on behalf of the OSM, issued a document entitled the Autism General Order #1[2], which set up a proceeding known as the "Omnibus Autism Proceeding" ("OAP").  In the OAP, a group of counsel selected from attorneys representing petitioners in the autism cases, known as the Petitioners' Steering Committee ("PSC"), was charged with obtaining and presenting evidence concerning the general issue of whether those vaccines can cause autism, and, if so, in what circumstances.  The evidence obtained in that general inquiry was to be applied to the individual cases. (*Autism General Order #1*, 2002 WL 31696785, at *3, 2002 U.S. Claims LEXIS 365, at *8.)

Ultimately, the PSC elected to present two different theories concerning the causation of autism.  The first theory alleged that the *measles* portion of the MMR vaccine can cause autism when it was alleged that thimerosal-containing vaccines previously weakened an infant's immune system.  This theory was presented in three separate Program "test cases" during several weeks of trial in 2007.  The second theory alleged that the mercury contained in thimerosal-containing vaccines *can directly affect* an infant's brain, thereby substantially contributing to the development of autism.  The second theory was presented in three additional "test cases" during several weeks of trial in 2008.

On February 12, 2009, three special masters issued separate decisions concerning the *first* theory, each determining that the evidence *failed* to demonstrate any general causal connection between the MMR vaccine and the development of ASDs.  I issued the decision in *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).  Special Master Patricia Campbell-Smith issued the decision in *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).  Special Master Denise Vowell issued the decision in *Snyder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).

---

[2] The *Autism General Order #1* is published at 2002 WL 31696785, 2002 U.S. Claims LEXIS 365 (Fed. Cl. Spec. Mstr. July 3, 2002).  I also note that the documents filed in the Omnibus Autism Proceeding are contained in a special file kept by the Clerk of this court, known as the "Autism Master File."  An electronic version of that File is maintained on this court's website.  This electronic version contains a "docket sheet" listing all of the items in this File, and also contains the complete text of most of the items in the File, with the exception of a few documents that are withheld from the website due to copyright considerations or due to § 12(d)(4)(A).  To access this electronic version of the Autism Master File, visit this court's website at www.uscfc.uscourts.gov.  Select the "Vaccine Claims" page, then the "Autism Proceeding" page.

Those three decisions were subsequently affirmed. *Hazlehurst v. HHS*, 88 Fed. Cl. 473 (2009); *Snyder v. HHS*, 88 Fed. Cl. 706 (2009); *Cedillo v. HHS*, 89 Fed. Cl. 158 (2009).  Two of those three rulings were then appealed to the U.S. Court of Appeals for the Federal Circuit, again resulting in affirmances of the decisions denying petitioners' claims. *Hazlehurst v. HHS*, 604 F.3d 1343 (Fed. Cir. 2010); *Cedillo v. HHS*, 617 F.3d 1328 (Fed. Cir. 2010).

On March 12, 2010, the same three special masters issued decisions pertaining to the second causation theory, each rejecting that *thimerosal-containing vaccines* can cause autism. *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).  None of those decisions was appealed.

After the proceedings for these six "test cases" concluded, remaining Petitioners in the OAP were instructed to decide whether to pursue their cases in light of the results of the "test cases," or to take other action to exit the OAP.  Petitioners in this case wished to proceed with their claim. (Response, filed Feb. 22, 2011.)

## II

## PROCEDURAL HISTORY OF THIS CASE

On January 4, 2004, Petitioners filed a "Short-Form Autism Petition for Vaccine Compensation," on behalf of their child, I.J.H., under the Vaccine Act.  By filing the Short-Form Petition, the Petitioners, in effect, alleged that as a result of one or more vaccinations covered under the Program, I.J.H. developed a neurodevelopmental disorder, consisting of an ASD or similar disorder, and that such disorder was caused by Measles-Mumps-Rubella ("MMR") vaccination; by the "thimerosal" ingredient in certain Diphtheria-Tetanus-Pertussis ("DTP"), Diphtheria-Tetanus-acellular Pertussis ("DTaP"), Hepatitis B, and *Haemophilus influenzae* type b ("Hib") vaccinations; or by some combination of the two. (*Autism General Order #1*, 2002 WL 3169785, at *8 (Fed. Cl. Spec. Mstr., July 3, 2002).)

Specifically, Petitioners alleged that vaccinations administered between November 1993 and March 1995, including Polio, DTP, Hib, MMR, and Hepatitis B, caused their son, I.J.H., to develop an ASD.  (Petition at 2.)  On April 7, 2004, the Secretary of Health and Human Services ("Respondent") filed a report, pursuant to Vaccine Rule 4(b), and some medical records.[3]

---

[3] Respondent filed two medical record exhibits, on April 7, 2004. (*See* Exs. A and B.)  Exhibit A was I.J.H.'s vaccination record, while Exhibit B was a psychological evaluation of I.J.H. performed by Sandra R. Kaler, Ph.D., during May and June of 2001.   According to Dr. Kaler, Petitioners requested a psychological evaluation because I.J.H. was experiencing behavioral difficulties at school, although intellectually he performed above his grade level. (Ex. B, p. 2.) Dr. Kaler noted I.J.H.'s history of attention deficit problems, treated initially with Ritalin, then with Adderall.  She noted that although I.J.H. was a child of superior intellect, he often exhibited inappropriate behaviors. She opined that this child's presentation was most consistent with a diagnosis of Asperger syndrome.  (Ex. B, p. 10.) Thus, on June 19, 2001, I.J.H. received a diagnosis of Asperger syndrome, which is a form of ASD.

Additionally, Respondent asked the Court to issue an Order directing Petitioners to Show Cause why Petitioners' claim should not be dismissed for untimely filing.

On June 15, 2004, Petitioners filed their Response to the Motion for Order to Show Cause, claiming that they met the requirements of the Vaccine Act's statute of limitations.  On October 29, 2004, I denied Respondent's Show Cause Motion because the records filed to date did not provide sufficient basis to decide whether the case was timely filed.  Proceedings were stayed until 2008, pending the outcome of the OAP "test cases."

On July 15, 2008, I issued my Order instructing Petitioners to file all relevant  medical records pertaining to I.J.H.  I also instructed Respondent to file a Statement regarding whether the claim should proceed in the OAP.  Petitioners submitted medical records on October 14, 2008. (Exs. 1-11.)

On November 24, 2008, Respondent filed a Motion to Dismiss pursuant to Vaccine Rule 21(b), arguing that the petition was filed more than three years after the expiration of the statutorily prescribed limitations period.  According to Respondent, Exhibits 1 through 11 showed that I.J.H. manifested symptoms of ASD as early as September 1995.  Petitioners responded, arguing that the petition should not be dismissed because the limitations period did not begin to run until after I.J.H. was *diagnosed* with ASD on June 19, 2001.  (Response, filed Jan. 26, 2009, pp. 3, 7.)

At this point in the litigation, proceedings were delayed again, pending the resolution of the OAP "test cases."  After the "test case" decisions were issued, on January 28, 2011, I instructed Petitioners to inform the Court whether they wished to proceed with their claim or exit the program.  Petitioners elected to proceed.  (Response, filed Feb. 22, 2011.)

In my Order issued on March 2, 2011, I requested that Petitioners provide the Court with a statement of their theory of causation linking I.J.H.'s vaccines to his ASD.  On April 1, 2011, Petitioners filed a Response, contending that the vaccines administered between 1993 and 1995 exacerbated existing conditions, which, in turn, led to the manifestation of ASD-like symptoms. (Response, p. 2.)

On July 27, 2011, I deferred any action concerning the timeliness of this case until the conclusion of a similar pending case, *Cloer v. HHS*, 654 F.3d 1322 (Fed. Cir. 2011) (*en banc*). After the Federal Circuit issued its decision in *Cloer,* Petitioners sought a ruling on the record, with no additional briefing. (Response, filed Sept. 25, 2012.)

I issued my Decision on September 12, 2013, dismissing this case as untimely filed. Judgment was entered on October 17, 2013.

On April 15, 2014, Petitioners filed a Motion for Attorneys' Fees and Costs ("Pet. Motion"), seeking a total award of $175,419.67.  The amount requested included:

- $22,110.50 for attorneys' fees incurred by Schmeltzer, Aptaker & Sheppard, P.C ("SAS"), for work performed almost exclusively by attorney Leon Taranto between 2003 and July 2006. (Pet. Motion, see attached Declaration of Paul Heylman, pp. 1-21); and,

- $152,861.50 for attorneys' fees, and $447.67 for costs incurred by Blank Rome LLP ("Blank Rome"), for work performed chiefly by attorneys Paul Honigberg, Hardy Vieux, and Leon Taranto between August 2006 and September 2013. (Pet. Motion, see attached Declaration of Paul M. Honigberg, pp. 1-35.)

On May 2, 2014, Respondent filed an Opposition to Petitioners' Motion, objecting to payment of any attorneys' fees because the petition was untimely filed, and thus Petitioners did not have a reasonable basis for filing their claim. In the alternative, Respondent argued that the requested fees and costs were grossly excessive. In their Reply to Respondent's Opposition, filed on May 12, 2014, Petitioners amended their request, asking for an award of $140,692.50 for attorneys' fees ($22,110.50 for Mr. Taranto while he worked at SAS; and $119,582.00 for Mr. Taranto and other Blank Rome attorneys). (Petitioners' Reply to Respondent's Opposition to Motion for Attorneys' Fees (hereinafter "Pet. Reply"), p. 2.)

## III

## LEGAL STANDARD FOR AWARDING ATTORNEYS' FEES AND COSTS

Section 15(e) of the Vaccine Act sets out the relevant provisions regarding attorneys' fees and costs:

> In awarding compensation on a petition filed under section 300aa-11 of this title the special master or court shall also award as part of such compensation an amount to cover –
> (A) reasonable attorneys' fees, and
> (B) other costs,
> incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioners' reasonable attorneys' fees and costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

§300aa-15(e)(1). "The determination of the amount of reasonable attorney's fees is within the special master's discretion." *Saxton v. HHS*, 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS*, 609 F.3d 1372, 1377 (Fed. Cir. 2010).

### A.      Timeliness

In general, the statute provides that no petition may be filed for compensation under the Program for a vaccine-related injury "*after the expiration of 36 months* after the date of the occurrence of the first symptom or manifestation of onset or of the significant aggravation of such injury."  § 300aa-16(a)(2) (emphasis added).

In recent years, there have been several appellate cases interpreting the start of the 36-month limitations period.  In particular, the Federal Circuit addressed this issue in situations in which the medical community at large does not recognize a link between a vaccine and a particular injury.  In 2010, the Federal Circuit held that "to be 'vaccine-related' the 'first symptom or manifestation of onset or of the significant aggravation of such injury' cannot occur until the medical community at large objectively recognizes a link between the vaccine and the injury."  *Cloer v. HHS*, 603 F.3d 1341, 1346 (Fed. Cir. 2010) ("*Cloer I*").

However, this interpretation was negated the following year.  In its decision on rehearing *en banc*, the Federal Circuit reversed its own 2010 panel ruling, holding that the medical community at large does *not* need to recognize a link, and that the statute of limitations "begins to run on the calendar date of the occurrence of the medically recognized symptom or manifestation of onset of the injury claimed by the petitioner."  *Cloer v. HHS*, 654 F.3d 1322, 1324-25 (Fed. Cir. 2011) (*en banc*), *cert. denied*, 132 S. Ct. 1908 (2012) ("*Cloer II*").  The Court also held that the doctrine of "equitable tolling" may apply to Vaccine Act cases under some circumstances. (*Id.*)

### B.      Eligibility for fees and costs in untimely-filed cases

In a subsequent ruling that considered only the attorneys' fees aspect of the *Cloer* case, in 2012, the Federal Circuit applied the doctrine of equitable tolling to untimely Vaccine Act cases. The Court held that petitioners may be eligible for an award of attorneys' fees and costs if they assert a non-frivolous limitations argument.  *Cloer v. HHS*, 675 F.3d 1358, 1359 (Fed. Cir. 2012)(hereinafter "*Cloer III*"), *aff'd*, *Sebelius v. Cloer*, 133 S. Ct. 1886 (2013).  In affirming *Cloer III*, the Supreme Court held that attorneys' fees and costs *may* be awarded in cases dismissed on timeliness grounds, so long as the petitioners brought their claim in good faith and with a reasonable basis.  *Sebelius v. Cloer*, 133 S. Ct. 1886, 1895-96 (2013).

### C.      Calculation of attorneys' fees and costs

This court has employed the "lodestar" method to determine reasonable attorneys' fees. *Avera v. HHS*, 515 F.3d 1343, 1347 (Fed. Cir. 2008); *Saxton*, 3 F.3d at 1521; *Rupert v. HHS*, 52 Fed. Cl. 684, 686 (2002).  The lodestar method, indeed, has been prescribed by the Supreme Court as the preferred method for the calculation of all attorneys' fees awarded by statute.  *City of Riverside v. Rivera*, 477 U.S. 561 (1986); *Hensley v. Eckerhart*, 461 U.S. 424, 429-37 (1983).

Under the lodestar approach, the basic calculation starts with the number of hours reasonably expended by the attorney, and then multiplies that figure by a reasonable hourly rate.

The reasonable hourly rate is "the prevailing market rate" in the relevant community for similar services, by lawyers of "comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). The burden is on the fee applicant to demonstrate that the rate claimed is appropriate. (*Id.*) To establish the prevailing market rate, the parties typically provide the special master with objective evidence of market rates for lawyers of varying skill levels, including affidavits and declarations of other attorneys or citations to prior precedents. *Hocraffer v. HHS*, No. 99-533, 2011 WL 6292218, at *6 (Fed. Cl. Spec. Mstr. Nov. 22, 2011); *Rupert v. HHS*, 52 Fed. Cl. 684, 688 (2002). Petitioners "should present adequate proof [of their requested rates and services] at the time of the submission." *Wasson v. HHS*, 24 Cl. Ct. 482, 484 n.1 (1991), *aff'd*, 988 F.2d 131 (Fed. Cir. 1993).

As the Supreme Court recognized in *Blum*, the determination of an appropriate market rate is "inherently difficult." *Blum*, 465 U.S. at 896 n.11. In light of this difficulty, the Court gave broad discretion to the trial judge to determine the prevailing market rate in the relevant community, given the individual circumstances of the case. (*Id.*)

Further, as to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS*, 86 Fed. Cl. 201, 215 (2009); *Hensley*, 461 U.S. at 437; *Rupert*, 52 Fed. Cl. at 686; *Wilcox v. HHS*, No. 90-991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997). The petitioner's burden of proof to demonstrate "reasonableness" applies equally to *costs* as well as to attorneys' fees. *Perreira v. HHS*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure. *Riggins v. HHS*, No. 99-382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd*, 40 Fed. App'x 479 (Fed. Cir. 2011); *Sabella v. HHS*, No. 02-1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part*, 86 Fed. Cl. 201 (2009). In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

> [i]n the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley*, 461 U.S. at 433-34). Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

Additionally, while a special master may choose to utilize a "line-by-line" analysis to analyze a fees and costs application, the special master is not *required* to do so. Depending on the circumstances of the case, the special master may find it appropriate to make a *percentage reduction* of hours, to use his or her experience to *estimate* a reasonable number of hours that it

7

should have taken to accomplish a particular task, or to use some other method to determine a reasonable amount for a fees or costs item. *Saxton*, 3 F. 2d at 1521 (50% reduction of attorney hours approved by Federal Circuit); *Wasson v. HHS*, 24 Cl. Ct. 482 at 484-86 (Cl. Ct. 1991), *aff'd*, 988 F. 2d 131 (Fed. Cir. 1993); *Riggins*, 2009 WL 3319818 at *4; *Jeffries v. HHS*, No. 99-670, 2006 WL 3903710, at *8 (Fed. Cl. Spec. Mstr. Dec. 15, 2006); *Ray v. HHS*, No. 04-184V, 2006 WL 1006587, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2006); *Broekelschen v. HHS*, No. 07-137, 2008 WL 5456319, at *6 (Fed. Cl. Spec. Mstr. Dec. 17, 2008); *Castillo v. HHS*, No. 95-652V, 1999 WL 1427754, at *3 (Fed. Cl. Spec. Mstr. Dec. 17, 1999).


# IV

## HISTORY OF ATTORNEY PARTICIPATION IN THIS CASE

In mid-December 2003, Petitioners originally contacted attorney Leon B. Taranto at SAS in Washington, D.C. (Petitioners' Memorandum of Law in Support of Motion for Attorneys' Fees (hereinafter "Pet. Memo"), p. 7, filed Apr. 15, 2014; *see also* Short-Form Petition, filed Jan. 5, 2004.)  At that time, Mr. Taranto had practiced law for about thirty years and had experience in the Justice Department's Civil Division, Torts Branch ("DOJ").  (Pet. Reply, p. 8.)  While at the DOJ, Mr. Taranto litigated cases involving health and medical issues, but he did not have experience with the Program.  (*See id.*; *see also* Declaration of Paul Heylman, with SAS Billing Records attached (hereinafter "SAS Billing"), filed April 15, 2014.)  After taking Petitioners' case, Mr. Taranto spent time learning about the Program, including reading the statute, court-issued documents, and website information. (Pet. Memo, p. 7; SAS Billing, p 1.)  He then prepared the "Short-Form Autism Petition for Compensation," which he filed on January 5, 2004.

After submitting the petition, Mr. Taranto researched the link between autism and vaccinations. (SAS Billing, pp. 2-4.)  Mr. Taranto also worked with Petitioners to collect and file medical records, and he researched short-form petitions, limitations issues, and the manifestation of injury in autism cases.  (Pet. Memo, pp. 7-8.)

On April 7, 2004, Respondent asked the Court to order Petitioners to "show cause" why their claim should not be dismissed for untimely filing.  To prepare a response, Mr. Taranto researched medical literature concerning autism and Asperger syndrome and reviewed I.J.H.'s medical records and assessments, including educational and psychological assessments.  (Pet. Memo, p. 8; SAS Billing, p. 10.)  Mr. Taranto also reviewed medical literature on ADHD and thimerosal.  (Pet. Memo, p. 8; SAS Billing, p. 11.)

On June 15, 2004, Petitioners filed a Response to Respondent's Motion for Order to Show Cause, claiming that they met the requirements of the Vaccine Act's statute of limitations.[4]

---

[4] Mr. Taranto also continued to bill hours after June 15, 2004 for "preparation of opposition to motion for show cause order."  (SAS Billing, p. 12.) (on June 23: "continued preparation of brief in opposition to motion to show cause order").

On October 29, 2004, I denied Respondent's Motion for Order to Show Cause.  I then stayed the proceedings pending the outcome of the OAP "test cases."  Mr. Taranto continued to bill hours while the proceedings were stayed, including more than 10 hours for "research re autism, vaccines, thimerosal, mercury, and health effects."  (SAS Billing, p. 21.)

In total, Mr. Taranto billed 73.4 hours between January 2004 and August 2006.  Petitioners' application for attorneys' fees and costs requests a total of $22,110.50 for work performed by Mr. Taranto while he was employed at SAS. (*Id.*)

In August 2006, Mr. Taranto moved his practice to the Blank Rome law firm, bringing this case with him.  Other attorneys at Blank Rome's Washington, D.C., office assisted in managing Petitioners' case until the entry of judgment on October 17, 2013.  (Pet. Memo, p. 8.)

Mr. Taranto continued to represent Petitioners after he moved his practice.  Between 2006 and 2007, while proceedings were stayed, he billed over 100 hours for monitoring the OAP proceedings.  (*Id.*; Declaration of Paul Honigberg, filed April 14, 2014,  with Blank Rome Billing Records attached, pp. 1-22 (hereinafter "Blank Rome Billing").)  Mr. Taranto and other Blank Rome legal personnel, including summer associates William Hoebel and Rickey Glover, and attorney Mr. Vieux, all attended OAP hearings, listened to testimony, reviewed court filings, and conducted legal research concerning possible links between vaccines or viruses and autism. (Blank Rome Billing, pp. 2-11.)

On July 15, 2008, I issued an Order instructing Petitioners to file certain medical records pertaining to I.J.H.  To prepare his Response, Mr. Taranto analyzed I.J.H.'s immunization, pediatric, hospital admission, educational and psychological assessment records.  (Blank Rome Billing, pp. 12-13.)  On October 14, 2008, Petitioners submitted various medical records. (Exs. 1-11.)  Mr. Taranto billed a total of 37 hours, at an attorney rate, for case-specific work related to the filing.  (Blank Rome Billing, pp. 11-14.)

On November 24, 2008, Respondent filed a Motion to Dismiss pursuant to Vaccine Rule 21(b), contending that the case should be dismissed as untimely filed.  To support this contention, Respondent indicated that, according to the medical records, I.J.H. had manifested symptoms of ASD as early as September 1995.  To prepare Petitioners' response to Respondent's Motion to Dismiss, Mr. Taranto read the Vaccine Rules, reviewed cases cited in Respondent's Motion to Dismiss, and conducted independent research.  (*See* Blank Rome Billing, pp. 15-17; Petitioners' Response in Opposition to Respondent's Motion to Dismiss, filed Jan. 26, 2009.)  In all, Mr. Taranto billed 28.6 hours, at an attorney rate, to produce Petitioners' Response.  (*Id.*)

Beginning in July 2009, Mr. Taranto reduced his involvement in this case and stopped billing any hours.  (*See* Blank Rome Billing, pp. 20-21.)  Mr. Honigberg and Mr. Vieux started to bill hours related to this case after July 2009.  In 2011, Mr. Taranto officially withdrew and Mr. Honigberg became counsel of record.  Mr. Honigberg had over thirty years of experience practicing law, including fifteen years with the Civil Division at the Justice Department and more than ten years in the Torts Branch. (Pet. Memo, p. 8.)  The record is devoid of any

information regarding Mr. Vieux's work experience.  (*See generally* Pet. Memo; Paul Honigberg Declaration, filed Apr. 15, 2014; Pet. Reply, filed May 12, 2014.)

Starting in July 2009, Mr. Honigberg and Mr. Vieux billed hours for the time they spent familiarizing themselves with Petitioners' case.[5]  Additionally, they prepared responses to the Orders issued on January 28, 2011 and March 2, 2011, which required research on the statute of limitations and a theory of causation.  (Pet. Memo, p. 8; Blank Rome Billing, pp. 23-26.)

After the Federal Circuit issued its *en banc* decision in *Cloer II* in August 2011, Mr. Honigberg researched whether a reasonable basis existed for Petitioners to remain in the Program, and prepared a report for the Petitioners.  (Pet. Memo, p. 9; Blank Rome Billing, p. 27.)  On September 25, 2012, Petitioners requested a ruling on the record in this case, with no additional briefing.   After I dismissed the case as untimely filed in September of 2013, Mr. Honigberg prepared a memorandum discussing that decision.  (Blank Rome Billing, p. 28.)

Petitioners initially sought an award of $175,419.67 for attorneys' fees and costs. (Motion, filed April 15, 2014, p. 1.)  This total amount included:

- $22,110.50 of fees for the 72.4 hours that Mr. Taranto billed while employed at SAS;

- $152,861.50 of fees for 362.6 hours of billing for services provided by Mr. Taranto and others at the Blank Rome firm;  and

- $447.67 for costs expended by the Blank Rome firm.

(Pet. Memo, pp. 8-9.)   On May 12, 2014, Petitioners filed a document that recalculated some of the hourly rates of their attorneys, and thereby reduced their total requested fees to $140,692.50, representing $22,110.50 of fees for Mr. Taranto while at SAS, and $118,562 of fees for Mr. Taranto and others at Blank Rome.  (Pet. Reply, p. 2, *see also* n.1.)  Petitioners' requested "costs" remained unchanged, at $447.67.

## V

## "REASONABLE BASIS" ISSUE

Respondent first argues that due to the untimely filing of the original petition in this case, there should be no award at all for attorneys' fees or costs in this case.  The "extent" of untimeliness of the original petition, according to Respondent, "precludes the objective finding

---

[5] Mr. Honigberg recorded a total of 8.9 hours between July 21, 2010, and Sept. 1, 2010, familiarizing himself with this case and conferring with Mr. Vieux and others, billing at a rate of $625 per hour; while during the same period, Mr. Vieux recorded a total of 20.2 hours to review the case and confer with Mr. Honigberg and others, billing at $480 per hour. (Blank Rome Billing, pp. 20-22.)

of reasonableness." (Respondent's Opposition to Petitioners' Fee Application, filed May 2, 2014 (hereinafter "Resp. Opp."), pp. 6-8.)

It must be noted that in *Sebelius v. Cloer*, 133 S.Ct. 1886, 1896-97 (2013), the U.S. Supreme Court addressed the possibility of awarding attorneys' fees even when a Vaccine Act petition was untimely filed. The Court observed that, "[t]he text of the statute is clear: like any other unsuccessful petition, an untimely petition brought in good faith and with a reasonable basis . . . is eligible for an award of attorney's fees." *Id.* at 1895. The Court further clarified that attorneys' fees and costs may be compensable for work performed on an unsuccessful petition, "irrespective of the reasons for the petition's failure." *Id.* at 1896. In this case, the petition was unsuccessful, due to a determination that the petition was untimely filed. (Decision, filed Sept. 12, 2013)   However, the Supreme Court has firmly established that untimely petitions may be eligible for an award of attorneys' fees and costs, when there is a showing of good faith and a reasonable basis.

Respondent does not contest that Petitioners filed their claim in "good faith." I find that this claim was filed in good faith. I have also carefully considered Respondent's arguments concerning "reasonable basis," but I do not find them persuasive. After reviewing the record, I conclude that the Petitioners *did* have a reasonable basis for initially *filing* their claim, and for *pursuing* it to the point at which they abandoned it.

Respondent specifically acknowledged that in 2004, I denied Respondent's Motion for an Order to Show Cause because, "the records filed to that date were not conclusive that the case was time-barred." (Resp. Opp., p.7.) My ruling stated,

> [T]he available records do *not* demonstrate that the petition was not timely filed. Those records, while certainly indicating some abnormalities (*e.g.*, "Attention Deficit Disorder") in [I.J.H.] prior to January 5, 2001 (the petition was filed on January 5, 2004), do *no*t make it clear whether the first symptoms of [I.J.H.'s] autism took place prior to January 5, 2001.

(Denial of Motion, filed Oct. 29, 2004.) Thus, during the first year of the pendency of this case, I ruled that the existing record would not support a ruling of untimeliness. The available evidence, *at that time*, indicated that Petitioners' claim had been filed in good faith and with a reasonable basis.

Thereafter, this case was stayed while the OAP "test cases" advanced. Petitioners' counsel sometimes attended those "test case" proceedings. Respondent argues that after Respondent's Motion for an Order to Show Cause, Petitioners were on notice that their case would be dismissed if additional medical records established that the case had been filed after expiration of the statute of limitations. (*Id.*) Respondent also argued that Petitioners did not have a reasonable basis because Petitioners did not make an effort to determine whether their case was time-barred, but instead monitored the OAP proceedings from 2006-2008. (Resp. Opp., p. 7.)

On July 15, 2008, the proceedings in this Hasson case resumed, pursuant to my Order requiring Petitioners to file all relevant medical records. Petitioners filed various medical records on October 14, 2008. (*See* Exs. 1 – 11.) Based on these newly filed records, Respondent filed a new Motion to Dismiss (for untimeliness), on November 24, 2008. Petitioners filed their Response on February 26, 2009, contending that Respondent was unable to identify any symptoms I.J.H. exhibited before January 2001, that "would be recognizable to the medical profession at large" as a sign of vaccine injury. (Petitioners' Response, p. 2, filed Jan. 26, 2009, *citing Markovitch v. HHS*, 477 F.3d 1353, 1360 (Fed. Cir. 2007).) This response indicates that in 2009, Petitioners advocated a statutory interpretation of timeliness that was *later* rejected, as described below.

Petitioners contend that they filed their claim based on a reasonable interpretation of the statute of limitations. At the time, they believed that the statute of limitations started to run on the date of I.J.H.'s *diagnosis* with Asperger syndrome, on June 19, 2001. (Pet. Reply, p. 4.) Petitioners filed their claim within 36 months after that diagnosis.

Further, Petitioners assert that the *Cloer I* decision *confirmed* the theory on which they had filed the petition and pursued their claim. (Pet. Reply, p. 6.) The *Cloer I* Court held that the statute of limitations does not begin to run until the medical community at large objectively recognizes a link between vaccine and injury. *Cloer I*, 603 F.3d at 1346. Thus, the argument that Petitioners presented in 2009, concerning the statute of limitations, appeared reasonable to the Federal Circuit's *Cloer I* panel on May 6, 2010, when that decision issued.

Petitioners also contend that they were first on notice that their claim was time-barred when the Federal Circuit, sitting *en banc*, reversed its earlier decision. *Cloer II*, 654 F.3d at 1324-25. (Pet. Reply, p. 6.) However, after the *en banc* decision in August 2011, that decision was appealed to the Supreme Court. The Supreme Court denied *certiorari* on April 16, 2012, in *Cloer v. Sebelius*, 132 S. Ct. 1908 (2012), thus establishing that the statute of limitations under the Vaccine Act starts to run on the day when the first symptom or manifestation of onset occurs, not on the date of diagnosis. Petitioners argue that the timeliness issue was not finally resolved until the Supreme Court's denial of *certiorari* in April 2012, and thus they had a reasonable basis for their timeliness claim until that point. On September 25, 2012, Petitioners ceased litigating and sought a ruling on the record.

Respondent argues that there was never a reasonable basis for filing the claim because the petition ultimately proved to be untimely filed. (Resp. Opp. at 6.) I find Respondent's argument unpersuasive. While Petitioners were pursuing their claim, there was an unsettled question of law related to the statute of limitations. The untimeliness of the Petitioners' claim was not a settled matter, and therefore the question of timeliness could not be determined until after the legal question was resolved. Until the U.S. Court of Appeals for the Federal Circuit issued its *en banc* decision in *Cloer II*, on August 5, 2011, and the Supreme Court denied *certiorari* on April 16, 2012, there were differing *plausible interpretations* concerning when Program petitions were timely filed. Indeed, the interpretation concerning the "timely filing" standard advanced by the Petitioners in this case was, in fact, adopted by a panel of the U.S. Court of Appeals for the Federal Circuit in *Cloer I*. That panel's view, of course, was eventually reversed by the *en banc*

decision in *Cloer II*.  But, Petitioners acted reasonably in maintaining their timeliness argument until the Supreme Court denied *certiorari* for the *Cloer II* decision.  They then appropriately ceased further litigation, seeking a ruling on the record without further briefing.  Petitioners asserted "an unsuccessful but nonfrivolous limitations claim," and they are "eligible for a determination of whether reasonable attorneys' fees and costs incurred in proceedings… should be awarded."  *Cloer III*, 675 F.3d 1358, at 1364.  Therefore, I find that Petitioners reasonably filed and pursued their claim until the date when they ceased litigating the merits of this case.[6]

## VI

### REASONABLE ATTORNEYS' FEES AND COSTS

Petitioners now seek an award of $140,692.50 for 436.4 hours of legal services spent on their case between 2004 and 2013.  (Pet. Reply, p. 2.)  Although the case was litigated for nearly ten years, the case was stayed for several of those years, pending the resolution of OAP "test" cases, and then the resolution of the timeliness issue in *Cloer II*.  After carefully examining the records and the parties' arguments, I have determined that the attorneys' fees and costs award should be sharply reduced to reflect only the *reasonable* hours expended in the litigation of this case and *reasonable* rates for the legal personnel involved in this case.

### A.    Hourly rates

First, Petitioners contend that Washington, D.C., rates are appropriate in this case because lawyers at the Washington, D.C. offices of SAS and Blank Rome had represented Petitioners.  (Pet. Reply, p. 8.)  While Petitioners concede that attorney billing rates in this case exceed those applied in other vaccine cases, Petitioners believe that their attorneys' experience justifies a higher rate of pay.  (*Id.*)

As explained above, I am compensating some hours for Messrs. Taranto, Honigberg, and Vieux at an attorney rate, and some hours expended by Mr. Taranto at a paralegal rate.  Accordingly, I must determine appropriate hourly rates for such hours.  Of the legal personnel involved, Petitioners provided a brief summary only of Mr. Taranto's and Mr. Honigberg's experience.  (Pet. Reply, p. 8.)  Neither Mr. Taranto nor Mr. Honigberg had any prior experience in the Program before this case.[7]

---

[6] Of course, in another case involving a clearly untimely petition, if work was performed after the date on which certiorari was denied in the *Cloer II* decision, I would *not* be likely to grant compensation.

[7] After reviewing the SAS and Blank Rome billing records, I conclude that Mr. Taranto cannot claim to be experienced in the Program. Mr. Taranto billed over seven hours in which he spent time familiarizing himself with the Program, including "read[ing] and analyz[ing] statutes governing National Vaccine Injury Compensation Program, petitions for compensation, and court orders, opinions, and website information" on 12/17/03, "review[ing] Court of Claims filings and orders re omnibus autism proceedings," on 12/19/03, "examin[ing] materials from Court of Claims, vaccine compensation program, and online websites for information re claims submission and autism proceedings," on 12/19/03, and "read[ing] Court of Federal Claims procedures for childhood

Respondent objected to the hourly rates claimed by Mr. Taranto.  Mr. Taranto billed at rates of either $290 per hour or $350 per hour, for work he performed while employed at SAS, and at a rate of $375 per hour while working at Blank Rome from 2006 to 2011, rates that Respondent contends should be reserved for attorneys with extensive Program experience. (Resp. Opp., p. 13.)

Respondent also objected to Mr. Honigberg's requested rates (varying from $595 to $710 per hour) as far exceeding hourly rates awarded to attorneys in the Program. (Resp. Opp., p. 12.) Additionally, Respondent stated that it did not appear that Mr. Honigberg had performed any "substantive legal work."  (*Id.*)  Respondent added that if any of Mr. Honigberg's hours were found to be reasonable, the rate should be lowered to reflect the rate of an attorney with similar skill, experience, and reputation.  (*Id.*)

Finally, Respondent objected to Mr. Vieux's requested rate of $480 per hour, because he did not have prior Program experience and because the rate did not reflect the simpler tasks performed.  (Resp. Opp., pp. 12-13. -- "he primarily performed legal research, reviewed medical records, and prepared internal documents.")  Thus, Respondent requested that Mr. Vieux's rate be lowered to compensate him at a paralegal rate.

In their reply, Petitioners amended their requested rates.  (Pet. Reply, p.  9, exhibit A -- seeking $340/hour for attorneys' work completed in 2006-2007, $350/hour for work completed in 2008-2009, $360/hour for work completed in 2010-2011.)  Petitioners cited *Estate of Oswalt v. HHS*, No. 03-2153, 2011 WL 2149932 (Fed. Cl. Spec. Mstr. May 2, 2011), to support their requested rates of payment for their attorneys.  (Pet. Reply, p. 9.)  However, the *Oswalt* decision did not endorse Petitioners' requested forum rates.  Instead, it granted awards based on $310/hour during 2006, $320/hour during 2007, and $335/hour during 2009, to a senior partner in a New York City law firm.  *Oswalt*, 2011 WL 2149932 at *10-11.

After reviewing Mr. Taranto's and Mr. Honigberg's years of experience, the locations of their practices, and their work on this case, I find that the hourly rates elaborated in *Oswalt* are appropriate for these attorneys.  In line with *Oswalt*, I will compensate Mr. Taranto at rates of $300/hour for work performed through May 2007, and $330/hour for work performed between May 2007 and January 2009.  In addition, I will compensate Mr. Honigberg at a rate of $340/hour for work completed in 2011 - 2013.  Because there is no record of Mr. Vieux's experience, and the exhibits support the conclusion that he was unfamiliar with the Program, I can compensate Mr. Vieux only at a rate of $200/hour.  For those occasions when attorneys performed paralegal-type work, they will be awarded fees at a rate of $100 per hour.

---

vaccine claims, court rules, and other information on proceedings" on11/28/06.  (SAS Billing, pp. 1-2; Blank Rome Billing, p. 3.)

### B.       Reasonable attorney hours

Petitioners submitted a fees application and supporting documents, which included: a memorandum of law; a declaration from attorney Paul Heylman, a former member of SAS; a declaration from attorney Paul Honigberg, currently a partner at Blank Rome; and a Reply to Respondent's objections.  (Pet. Motion, filed Apr. 15, 2014; Pet. Reply, filed May 12, 2014.)

Petitioners requested payment for the 73.4 hours billed by Mr. Taranto while working at SAS, and for the 362.6 hours billed at Blank Rome primarily by Mr. Taranto, Mr. Honigberg, and Mr. Vieux.  Respondent characterized Petitioners' request for payment for work performed by their attorneys as "grossly excessive." (Resp. Opp., p. 9.)[8]

Respondent asserts that the majority of billed hours were spent monitoring the OAP proceedings, while this particular case was stayed, and that this amount of time was excessive. (Resp. Opp. at 10 -- "petitioners' counsel billed for more than 100 hours between 2006-2007 on general OAP litigation.")  Respondent also asserts that Mr. Taranto unreasonably continued to spend time on general OAP monitoring even after responding to Respondent's Motion to Dismiss. (Motion, filed Nov. 24, 2008; Resp. Opp., p. 11.)  Additionally, Respondent argues that by 2011, when Mr. Taranto withdrew as counsel of record and Mr. Honigberg replaced him, Mr. Taranto had billed for more than forty hours for activities that were then duplicated by his successor, including review of the file, the OAP litigation, and OAP "test case" decisions. (Resp. Opp., p. 11.)

Respondent contends that the only substantive work performed by Mr. Taranto after August 2006, when he moved to Blank Rome, was his filing of certain medical records in response to a court order.  (Resp. Opp., p. 9.)

In order to analyze Petitioners' fee application and the parties' respective arguments, I have divided Petitioners' request into categories of compensable and non-compensable time, based on whether the services rendered by counsel were reasonable and necessary.  Petitioners may be compensated for attorney time spent on: (1) OAP monitoring to a limited degree; (2) responding to my Order issued on July 15, 2008, asking Petitioners to file certain medical records; (3) responding to Respondent's Motion to Dismiss filed on November 24, 2008; (4) responding to my Orders of January 28, 2011, and March 2, 2011, which required Petitioners to provide the court with a theory of causation; (5) reading the *Cloer II en banc* decision and requesting a ruling on the record; and (6) performing various services for Petitioners *after* requesting a ruling on the record.  (Other time not in these six categories I found to be unreasonably billed.)  I then reviewed the record to determine the reasonableness of the hours spent during each segment.  *See Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) ("[T]rial courts may take into account their overall sense of the suit, and may use estimates in calculating and allocating an attorney's time.").

---

[8] In their Reply, Petitioners correctly state that Respondent failed to expressly object to the 73.4 hours Mr. Taranto billed while at SAS. (Pet. Reply at 2 n.1.) However, Respondent did object generally to "the payment of attorneys' fees in this case." (Resp. Opp. at 1.) In any event, it is my duty to pay only for hours that I deem reasonable, whether Respondent specifically objected to those hours or not.

1.      *"Monitoring" the OAP proceedings--2003-2010*

From December 2003 to July 2006, Mr. Taranto billed a total of 17.7 hours, at $290/hour between December 2003 and January 2006, and at $350/hour during February-July 2006, for "monitoring" OAP proceedings.  (SAS Billing, pp. 2, 5-6, 8, 16-21.)  From November 2006 until November 2010, Mr. Taranto, Mr. Vieux, and summer associates William Hoebel and Rickey Glover together billed a total of 182.4 hours for "monitoring" the OAP proceedings.  (Blank Rome Billing, pp. 3-14, 17-22.) (Mr. Taranto - 128.4 hours at $375/hour; Mr. Hoebel - 19 hours at $235/hour; Mr. Glover - 20.6 hours at $235/hour; and Mr. Vieux - 14.4 hours at $480/hour.)

I am not persuaded by Petitioners' argument that all of their billed hours spent "monitoring OAP proceedings" should be compensated. First, I find it unreasonable that so many people were involved. Additionally, Petitioners' counsel spent an excessive amount of time monitoring the OAP proceedings, including attending the "test case" hearings, listening to broadcasts, and giving summer associates the task of summarizing testimony, when counsel could have reasonably merely awaited the outcome of the test cases before assessing the viability of Petitioners' claim -- *as did the vast majority of the attorneys in the more than 5,000 OAP cases which were not selected as "test cases*." (*See, e.g*., fn 10 below).  This is particularly true when, on April 7, 2004, counsel was apprised, by the filing of Respondent's Report, that there was a *serious* question whether this case was even timely filed.  Moreover, Petitioners' counsel did *not* play a role in the OAP test cases.  (Resp. Opp., p. 10.)  Therefore, I find it reasonable to award a total of 10 hours at an attorney rate ($300 per hour) for Mr. Taranto's work in monitoring the OAP proceedings from 2003 to May 2007.  Additionally, I find it reasonable to award 20 hours at a paralegal rate ($100 per hour) and 20 hours at an attorney rate ($330 per hour, averaging of the rates of $320 for 2008 and $340 for 2010) for Mr. Taranto's work in monitoring the OAP proceedings during the May 2007-June 2010 period. Payment for the time spent by Petitioners' other legal "observers" of the OAP is not appropriate because the work was unnecessary.

2.      *Obtaining medical records, July 15--October 14, 2008*

On July 15, 2008, I issued my Order requesting that Petitioners file medical records. Mr. Taranto billed 15.2 attorney hours from July 16, 2008 through October 14, 2008, for case-specific work acquiring and organizing medical records pursuant to my Order, and for filing a set of medical records on October 14, 2008.[9]  (Blank Rome Billing, pp. 11-14.)  Although special masters usually request that Petitioners' counsel bill their time in increments of one tenth of an hour, Mr. Taranto often billed his time in much larger increments.  It also appears to me that Mr. Taranto billed for an excessive number of hours to accomplish this task.

Special masters may reduce the rate for billing entries, rather than deny the request, if petitioners submit hours billed at an attorney rate for performing paralegal work.  In *Valdes v. HHS*, 89 Fed. Cl. 415, 425 (2009), the court held that obtaining medical records was more

---

[9] He also spent 32.7 hours in monitoring the OAP test case proceedings during that same two-month period.

consistent with *paralegal* duties, and that the special master should have approved the fees request at a paralegal rate instead of completely denying requested fees for this work.

On September 4, 2008, Mr. Taranto spent two hours reading I.J.H.'s immunization, pediatric, hospital admission, educational, and psychological assessment records, identifying records to be submitted in support of the petition, and requesting additional records. (Blank Rome Billing, p. 12.)  On October 7, 2008, he billed 2.2 hours to "read and analyze medical, hospital, psychological assessment, and educational records," and to organize the records for submission. (*Id.*, p. 13.)  He billed 1.8 hours for the same tasks on October 8, 2008. (*Id.*)  He also billed 2.2 hours for preparing the Statement of Compliance. (*Id.*)

Mr. Taranto often lumped together diverse events under a single entry in his billing record, each of which should have been separately accounted for using a standard tenth-of-an-hour billing convention. *See Savin ex rel. Savin v. HHS*, 85 Fed. Cl. 313, 317 (2008).   For example, Mr. Taranto billed for 5.4 hours of work performed on October 13, 2008, which he spent examining medical records, compiling records, examining CD files, revising a statement of compliance, and monitoring the OAP proceedings. (*Id.*, p. 14.)

After examining the billing records related to the period from July 15-October 14, 2008, I find that the total number of hours billed by Mr. Taranto should be reduced, and that the hours he spent performing paralegal duties, including obtaining and examining medical files, should be compensated at a paralegal rate.  Mr. Taranto will be compensated at an attorney rate for his work on the Statement of Completion, and evaluating the medical records.  Mr. Taranto will be compensated for 8 hours of work at an attorney rate of $330 per hour, and for 10 hours at a paralegal rate of $100 per hour.

### 3.   *Responding to Respondent's Motion to Dismiss, November 24, 2008-- January 26, 2009*

On November 24, 2008, Respondent filed a Motion to Dismiss, alleging untimely filing of the petition.  Mr. Taranto billed 28.6 hours at an attorney rate, from December 2, 2008 through January 7, 2009, to prepare Petitioners' Opposition to Respondent's Motion to Dismiss. During this time, Mr. Taranto billed in large increments of time, including, for example 5.2 hours to "prepare draft response in opposition to respondent's motion to dismiss; examine respondent's motion, related cases, and [I.J.H.'s] records for preparing response."  (Blank Rome Billing, p. 17--Dec. 8, 2008.)  Mr. Taranto also seems to have billed for duplicative activities.  For example, the descriptions of the work billed on December 3, 2008, and December 4, 2008, are nearly identical.  On December 3, 2008, Mr. Taranto billed 4.2 hours. (Blank Rome Billing, p. 16.)  He described the work as follows: "review respondent's motion to dismiss, cited cases, and records; read and analyze related cases concerning application of statute of limitations defense in vaccine act cases, commencement of limitations period on appearance of first symptoms of objectively recognizable vaccine injury or autism." (*Id.*)  On December 4, 2008, Mr. Taranto billed 2.1 hours for his work including "review[ing] respondent's motion to dismiss, cited cases, and records; read[ing] and analyz[ing] related cases on applying statute of limitations in vaccine act cases and commencing limitations period in autism cases." (*Id.*)  The descriptions of services

performed in two entries dated December 8, 2008, and January 5, 2009, are also quite similar. (*Id.*, p. 17.) (billing 5.2 hours and 2.4 hours, respectively.)

In my opinion, an attorney billing at the high rate claimed by Mr. Taranto should have performed these tasks with much greater efficiency, and he billed an excessive number of hours for this period.  His end product, the Response filed on January 26, 2009, totaled 7 pages, with 7 pages of exhibits appended, for which he billed 28.6 hours.[10]  Mr. Taranto billed for large amounts of time, including one entry for 5.2 hours and several other entries of more than two hours, lumping tasks together that could easily have been separated into multiple, precise entries. (Blank Rome Billing, p. 17 -- 12/08/08: "prepare draft response in opposition to respondent's motion to dismiss; examine respondent's motion related cases and [I.J.H.'s] records for preparing response.)

Therefore, because I find that Mr. Taranto's work was both excessive and repetitive, I will reduce his hours.  Mr. Taranto will be awarded 20 hours at the 2008 rate of $330.

### 4.      Preparing Petitioners' "Theory of causation"--March 2 to April 1, 2011

On March 2, 2011, I issued my Order requiring Petitioners to file a statement identifying their theory of causation, linking I.J.H.'s ASD to the vaccinations he received.

Two attorneys billed for the time they spent responding to that Order.  Mr. Vieux billed 34.8 hours between March 8, 2011, and April 1, 2011.  (Blank Rome Billing, pp. 25-26.)  For the majority of that time, Mr. Vieux researched "re: possible response to court's order requesting Hasson family to identify cause of [I.J.H.'s] Asperger's syndrome" and "re: causation link between [I.J.H's] Asperger's syndrome and vaccinations." (*Id.* -- 3/14/11 for 3.4 hours, 3/15/11 for 3.6 hours, 3/16/11 for 3.2 hours, 3/18/11 for 2.8 hours, 3/28/11 for 5.4 hours, and 3/29/11 for 6.8 hours.) Also, some of Mr. Vieux's work seems duplicative, including the 1.8 hours billed on March 8, and the 2.2 hours on March 11, with identical work descriptions.  (*Id.*)  Mr. Vieux also spent time on March 29 and March 30, 2011, drafting the Statement of Causation.  (*Id.*, p. 26.)

Mr. Honigberg also billed 2.2 hours related to work on the Statement of Causation. (Blank Rome Billing, pp. 25-26.)  He billed 1.2 hours for office and telephone conferences and one hour to review and revise the Statement.  (*Id.*)

It is, of course, a daunting task for a petitioner's attorney to produce a theory of medical causation.[11]  However, after reviewing the billing records and the work product filed on April 1,

---

[10] The exhibits were printed out web pages outlining ADHD symptoms, exhibit one from the Centers for Disease Control and Prevention, and exhibit two from Merck & Co.  Mr. Taranto did not provide any additional analysis in the exhibits.

[11] A reader of this opinion might reasonably wonder why I even asked Petitioners to prepare a "theory of causation" while the timely filing aspect of this case was still in doubt.  The short answer is that during much of the pendency of this case there were over 5,000 autism cases on my personal docket, and many procedural orders were sent out for *all* pending petitioners with autism cases, by court staff attorneys.  This situation continued after early 2007, when

2011, I conclude that the total number of hours claimed for producing the product was excessive. The end result of all the hours billed was a two-page document, with a single item of medical literature attached. (*See* Petitioners' Response to Court Order, filed Apr. 1, 2011.) Accordingly, I am rejecting Mr. Vieux's requested hours on 3/15/11, 3/16/11, 3/18/11, and 3/28/11. Furthermore, I am reducing the remaining requested hours by 50% because the request was excessive. Therefore, I will compensate Mr. Vieux for 15 hours of work at a rate of $200 per hour.  I will compensate Mr. Honigberg for 2.2 hours of work at a rate of $340 per hour.

### 5. *Hours spent after Cloer II, determining to cease litigation on the merits – July 2011 to September 25, 2012*

On August 5, 2011, the Federal Circuit, sitting *en banc*, reversed its panel's decision in *Cloer I*.  I had previously deferred any action in this case until after the Federal Circuit issued a decision in the rehearing. (*See* Order, filed July 27, 2011.)  After the Supreme Court denied *certiorari* on April 16, 2012, the Federal Circuit's decision in *Cloer II* became the last word on timely filings in Vaccine Act cases.  On August 27, 2012, I issued my order to Petitioners, requesting a statement whether Petitioners wished to file additional arguments following the *Cloer II* decision.  On September 25, 2012, Petitioners filed their response, indicating that they sought a ruling on the record with no additional briefing.

Mr. Honigberg billed 12.1 hours from July 29, 2011 to September 25, 2012.  I find that 10 hours was a reasonable amount of time for Mr. Honigberg to spend reading the *Cloer II* decision, discussing its implications with his clients, then drafting and submitting a response to my order.  Therefore, I will compensate Mr. Honigberg for 10 hours at an attorney rate of $340/hour.

### 6. *Hours spent by counsel after requesting a ruling on the record*

After filing a request for a ruling on the record, Petitioners' counsel spent time performing various significant legal services, including explaining the decision to Petitioners, requesting redaction of the decision for publication, and preparing an application for attorneys' fees and costs.  Some of the hours billed for these services are unreasonable and will not be compensated.  I will compensate Petitioners for 10 hours billed by Mr. Honigsberg during this period.

### C. Costs

Petitioners filed appropriate documentation in support of their request for compensation for attorneys' costs of $447.67.  (Blank Rome Billing, p. 30.)  Respondent does not contest these particular expenses. I will compensate Petitioners for $447.67 of their attorneys' costs.

---

the autism cases were split into the dockets of three special masters, including myself, but each of the three still had close to 2,000 autism cases on each of our dockets, plus other non-autism cases.  The Order sent out in this case on March 2, 2011, was an Order sent out to virtually all of the many pending autism petitioners about that time, by court staff attorneys.  Therefore, having asked Petitioners' attorneys to respond to that Order, I find it reasonable and appropriate to compensate those attorneys for time reasonably spent on responding to that Order.

## VII

## CONCLUSION

Attorneys' fees and costs are awarded as follows:

**1.**     **OAP Research, 2003--2010**

| | | |
|---|---|---|
| Leon B. Taranto (2003 - May 2007) | 10 hours @ $300/hour | $ 3,000.00 |
| Leon B. Taranto (May 2007 - 2010) | 20 hours @ $330/hour | $ 6,600.00 |
| Leon B. Taranto (May 2007 - 2010) | 20 hours @ $100/hour | $ 2,000.00 |

**2.**     **Request for Medical Records, July--October 2008**

| | | |
|---|---|---|
| Leon B. Taranto | 8 hours @ $330/hour | $ 2,640.00 |
| Leon B. Taranto | 10 hours @ $100/hour | $ 1,000.00 |

**3.**     **Response to Respondent's Motion to Dismiss, November 2008--January 2009**

| | | |
|---|---|---|
| Leon B. Taranto | 20 hours @ $330/hour | $ 6,600.00 |

**4.**     **Theory of Causation March--April 2011**

| | | |
|---|---|---|
| Hardy Vieux | 15 hours @ $200/hour | $ 3,000.00 |
| Paul Honigberg | 2.2 hours @ $340/hour | $ 748.00 |

**5.**     **Post-*Cloer* II activities, May--September 25, 2012**

| | | |
|---|---|---|
| Paul Honigberg | 10 hours @ $340/hour | $ 3,400.00 |

**6.**     **Attorney services provided after September 25, 2012**

| | | |
|---|---|---|
| Paul Honigberg | 10 hours @ $340/hour | <u>$ 3,400.00</u> |

| | | |
|---|---|---|
| Total Attorneys' Fees = | | $ 32,388.00 |
| Attorneys' costs | + | <u>$ 447.67</u> |
| Total Award | | $ 32,835.67 |

A total of $ 32,835.67 is awarded pursuant to 42 U.S.C. § 300aa-15(b) and (e)(1), in the form of a check payable jointly to Petitioners and current Petitioners' counsel of record, Paul Honigberg, on account of legal services performed on Petitioners' behalf.  (This sum is to compensate Messrs. Taranto, Honigberg, and Vieux, *and should* be distributed by Mr. Honigberg accordingly.)[12]

In the absence of a timely-filed motion for review filed pursuant to Appendix B of the Rules of the U.S. Court of Federal Claims, the clerk of the court shall enter judgment in accordance herewith.

**IT IS SO ORDERED.**

/s/ George L. Hastings, Jr.
George L. Hastings, Jr.
Special Master

---

[12] The total amount awarded in this case, is, in fact, quite generous, in my view.  It appears that in most of the autism cases associated with the OAP, not counting the "test cases" themselves, those attorneys who merely had their cases stayed while the OAP test cases were litigated, then eventually dismissed their cases for reasons of untimely filing or other reasons of inability to prove their cases, received, on average, substantially *lower* awards of fees and costs. *See e.g.*, *Carter ex rel. Carter v. HHS*, No. 02-1028V, 2010 WL 5561067 (Fed. Cl. Spec. Mstr. Dec. 15, 2010); *Whiffen ex rel. Whiffen v. HHS*, No. 3-1223V, 2010 WL 5558348 (Fed. Cl. Spec. Mstr. Dec. 15, 2010); *Hughes ex rel. Hughes v. HHS*, No. 04-1115V, 2010 WL 5558441 (Fed. Cl. Spec. Mstr. Dec. 15, 2010); *Sampson ex rel. Sampson v. HHS*, No. 03-943V, 2010 WL 5561069 (Fed. Cl. Spec. Mstr. Dec. 15, 2010).